```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
                      SOUTHERN DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :
                              :
      v.                       :     Criminal No. 17-2534-TJS
                              :
LEE ELBAZ,                     :
                              :
          Defendant.           :
                              :
- - - - - - - - - - - - - - - x     September 20, 2017

                                    Greenbelt, Maryland
```

**DETENTION HEARING**


BEFORE:   THE HONORABLE TIMOTHY J. SULLIVAN, Magistrate Judge

APPEARANCES:              ANKUSH KHARDORI, Esq.
                          1400 New York Avenue, NW
                          Washington, DC 20005
                            On Behalf of the Government

                          NICOLAS A. MITCHELL, Esq.
                          Office of the U.S. Attorney
                          6500 Cherrywood Lane, Suite 200
                          Greenbelt, MD  20770
                            On Behalf of the Government

                          JONATHAN LOPEZ, Esq.
                          Orrick, Herrington and Sutcliffe, LLP
                          1152 15th St. NW
                          Washington, DC 20005
                            On Behalf of the Defendant

Audio Operator:           Brandon Mottley

Transcription Company:    CompuScribe
                          5100 Forbes Boulevard
                          Suite 101
                          Lanham, MD  20706
                          (301) 577-5882


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

# I N D E X

                                                                    Page

Preliminary Matters                                             3

Qualification of Defendant                                      4

Comments by Ankush Khardori, Esq.
  On Behalf of the Government                                   19

Comments by Jonathan Lopez, Esq.
  On Behalf of the Defendant                                    25

Rebuttal by Ankush Khardori, Esq.                              54

Comments by Beverly McCabe, Pretrial Services                  61

Comments by Third-Party Custodian Lemore Elbaz                 62

Ruling by Magistrate Judge Timothy J. Sullivan                 66

KEYNOTE:   "---" indicates inaudible in the transcript.
           "*"  indicates word is phonetically spelled.

1                        P R O C E E D I N G S

2              (Whereupon, at 9:06 a.m., the proceeding began.)

3                   THE CLERK:  The Honorable Timothy J. Sullivan

4    presiding.

5                   THE COURT:  Good morning, everybody.  Have a seat.

6    Government, call the case, please.

7                   MR. KHARDORI:  United States of America versus Lee

8    Elbaz.  Criminal Case No. TJS-17-2534.

9                   THE COURT:  Thank you.  And you are --

10                  MR. KHARDORI:  Ankush Khardori on behalf of the

11   Government, along with Nick Mitchell.

12                  THE COURT:  All right, thank you.

13                  MR. MITCHELL:  Good morning, Your Honor.

14                  THE COURT:  Good morning.

15                  MR. LOPEZ:  Good morning, Your Honor.  Jonathan

16   Lopez from Orrick Herrington on behalf of my client, Lee

17   Elbaz, who is present.

18                  THE COURT:  Mr. Lopez, have you entered your

19   appearance with the Court electronically?

20                  MR. LOPEZ:  Your Honor, I have not.  I have an

21   appearance form.

22                  THE COURT:  Okay, you have a hard copy?

23                  MR. LOPEZ:  I do have a hard copy, I just don't

24   remember my bar number.

25                  THE COURT:  All right.  Well, why don't you pass

1  your hard copy up to the courtroom deputy.  We will make sure

2  that it gets docketed.

3          MR. LOPEZ:  May I approach, Your Honor?

4          THE COURT:  Sure, absolutely.

5      (Pause)

6          THE COURT:  Ma'am, you are Lee Elbaz?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Please stand and pull that microphone in

9  front of you.  And please raise your right hand.

10     (Whereupon, the Defendant was sworn.)

11         THE COURT:  You may put your hand down?  Ma'am, what

12 is your full name?

13         THE DEFENDANT:  Lee Elbaz.

14         THE COURT:  And how old are you?

15         THE DEFENDANT:  36 and a week.

16         THE COURT:  30 --

17         THE DEFENDANT:  36 and a week.

18         THE COURT:  36.  So you are 35 now.

19         THE DEFENDANT:  No.

20         MR. LOPEZ:  Her birthday was a week ago.  She is 36

21 and a 1 week.

22         THE COURT:  Okay, 36 and a week.  Okay, so you are

23 36.  How far did you go in school?

24         THE DEFENDANT:  I start my academic degree and

25 unfortunately I don't have the money to finish it.  So I miss

1   three courses.

2           THE COURT:  Okay.  Do you read, write and understand

3   English?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Is English your native language?

6           THE DEFENDANT:  No, sir.

7           THE COURT:  Here and in the Eastern District of New

8   York yesterday, did you have any trouble understanding the

9   court proceedings in English?

10          THE DEFENDANT:  No, I have somebody who was from the

11  courts to explain to me.  But I understand 99.9 of the things.

12          THE COURT:  And that is my question.  Do you need a

13  Hebrew interpreter here today to help you understand what is

14  going on?

15          THE DEFENDANT:  No, sir.  No, sir.

16          THE COURT:  No?  All right.  Are you a United States

17  citizen?

18          THE DEFENDANT:  No, sir.

19          THE COURT:  What is your country of origin?

20          THE DEFENDANT:  Israel.

21          THE COURT:  Because of your nationality, the

22  Government -- as a non-U.S. citizen who has been arrested or

23  detained, you may request that the Government notify your

24  country's consulate officers here in the United States of your

25  situation.  You may also communicate with your consulate

1    officer.  A consulate officer may be able to help you obtain

2    legal representation and may contact your family and visit you

3    in detention, among other things.

4           If you want the Government to notify your consulate

5    officers of Israel, you can request this notification now or

6    any time in the future.  Do you want the Government to notify

7    your consulate officer at this time or do you defer?

8           THE DEFENDANT:  Defer.

9           THE COURT:  Ma'am, are you under the influence of

10   any drugs, alcohol or medication that would in any way

11   interfere with your ability to understand these proceedings?

12          THE DEFENDANT:  Can you repeat, please?

13          THE COURT:  Are you under the influence of any

14   drugs, alcohol or medication that would in any way interfere

15   with your ability to understand these proceedings?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Are you under the active care of a

18   medical doctor or mental health professional for any reason?

19          THE DEFENDANT:  No, sir.

20          THE COURT:  Okay.  Have you received a copy of the

21   criminal complaint that has been filed and the affidavit in

22   support of the criminal complaint that has been filed?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Okay.  You can have a seat.

25          THE DEFENDANT:  Thank you, sir.

1            THE COURT:  Ma'am, my name is Tim Sullivan.  I am

2    one of the Magistrate Judges here.  You are now in the United

3    States District Court for the District of Maryland.  This is

4    the jurisdiction that the criminal charge against you has been

5    filed.  A lot of what we are doing today you went through

6    yesterday at your initial appearance on your Rule 5 out in the

7    Eastern District of  New York but we are going to repeat that

8    today.

9            The purpose of this proceeding is to advise you of

10   the nature of the charges against you, to talk to you about

11   important constitutional rights that you have, and to talk

12   about your release status; that is, whether you stay in the

13   custody of the United States marshal, pending the completion

14   of this case, or whether you can be returned to the community

15   under conditions and/or a combination of conditions of

16   release.

17           Ma'am, in the criminal complaint, as you know, you

18   are charged with wire fraud in violation of Title 18 of the

19   United States Code, Section 1343, as well as conspiracy to

20   commit wire fraud in violation of Title 18 of the United

21   States Code, Section 1349.  And Government, the maximum

22   possible penalty?

23           MR. KHARDORI:  20 years and a $250,000 fine.

24           THE COURT:  Per count.

25           MR. KHARDORI:  That is correct.

1              THE COURT:  And $100 special assessment and the

2    possibility of forfeiture.

3              MR. KHARDORI:  Yes, Your Honor.

4              THE COURT:  Ma'am, do you understand generally the

5    nature of these two charges as well as the maximum possible

6    penalties, knowing that there is no parole in the federal

7    system?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  You can have a seat.  You don't have to

10   stand up anymore.  Thank you.

11             Ma'am, you have important constitutional rights as a

12   criminal defendant.  The first is your 5th Amendment right to

13   remain silent.  Nobody can force, make or coerce you to say

14   anything.  Anything you say may be used against you.  Do you

15   understand your 5th Amendment right to remain silent?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Ma'am, you also have the very important

18   6th Amendment right to be represented by an attorney at every

19   stage of these proceedings.  You have counsel here today.

20   They are your retained counsel, your counsel of choice.

21             I am advising you that if at any point you find

22   yourself without an attorney, you can ask the Court to

23   consider the appointment of counsel for you if you financially

24   qualify.  Do you understand that?

25             THE DEFENDANT:  Yes, sir.

 1              THE COURT:  Government, on release?

 2              MR. KHARDORI:  Your Honor, the Government is seeking

 3    detention.  We are prepared to argue.

 4              THE COURT:  Okay.  What are your reasons for

 5    detention?  I mean, I don't need to hear the whole

 6    presentation now but danger, flight --

 7              MR. KHARDORI:  Flight.  Flight is the principle

 8    issue here.  The Defendant obviously is an Israeli citizen.

 9    She has very, very limited contacts with the US.

10              THE COURT:  Counsel, any preliminary comments on

11    anything?  Are you ready to go forward with the detention

12    hearing or do you want to set it in at a later date?

13              MR. LOPEZ:  No, I would like to move forward today,

14    Your Honor.  And if I may be heard, this is a perfect time if

15    you would like to hear my thoughts.

16              THE COURT:  Let me, let me -- I don't need to, not

17    right this second.  Look, I have read the Eastern District of

18    New York pretrial services report, and quite frankly, I want

19    another one done by our pretrial services officers.

20              I want it to supplement it.  There are too many

21    holes and gaps.  I mean, I give her credit for being here

22    today but I have a lot of issues with the report and I am not

23    satisfied with her report as it was done in the Eastern

24    District, and I am going to continue this for a little bit

25    this morning to allow your client, if you choose.

1            If you choose that she doesn't want to be

2    interviewed, that is fine too but I want a supplemental report

3    prepared by our pretrial services office to bolster and give

4    me some more information about this -- about your client.

5            So that is what we are going to do and then we will

6    move forward with a hearing later on today, all right,

7    whenever pretrial is ready.

8            Ma'am, I am going to continue this.  I don't know

9    enough about you except to know that you are not a United

10   States citizen and, from what I see, you know two people in

11   the United States of America.  One in San Francisco and one in

12   New York.

13           So I think the Government is totally right to

14   consider you to be a flight risk.  My question in my mind is

15   whether I detain you right not to be interviewed or whether I

16   trust you enough to stay in this building with your attorney

17   and to be interviewed by pretrial services and then come back

18   when we have a hearing.

19           Let me ask -- Ms. McCabe, how long will it take you

20   to do a supplemental report, do you think, given the schedule

21   today?

22           MS. McCABE: Your Honor, I believe from start to

23   finish, with the verifications, about approximately an hour.

24           THE COURT:  Okay, that sounds fine.  I am going to

25   let you -- I am not going to you detain you or anything right

1   now but here is what I am ordering.

2            You are to leave this courtroom and go directly with

3   the pretrial services officers and your counsel to their

4   office downstairs.  You can talk to your lawyer in private

5   about whether or not you want to provide any information or

6   not.  You are not required to.

7            If you choose not to, you don't have to have to do

8   that, and I will just rely on what you told the pretrial

9   services office in the Eastern District of New York.

10           We will regroup at -- let's just say 10:30 a.m.  We

11  will reschedule this for 10:30 a.m. and we will have a

12  detention hearing at 10:30 a.m.

13           Ma'am, I don't know what the Magistrate Judge told

14  you in New York but let me tell you that all federal courts

15  throughout the country -- Eastern District of New York,

16  District of Maryland -- we all have to file the Bail Reform

17  Act.

18           Under the Bail Reform Act, a Magistrate Judge such

19  as myself has to look at two things: Are you a danger to the

20  community and in my view, counsel, I don't know if you have

21  ever appeared in front of me before, economic danger to the

22  community is a real big deal to me.

23           So, you know, that is a factor.  And the other

24  factor is risk of flight, whether or not there is a serious

25  risk that you will not appear as required, or whether you will

1  disappear.

2          For example, try to get back to Israel, for example,

3  or to some other country -- Czech Republic or wherever else

4  you have traveled to.

5          And then I have to listen to the parties' arguments

6  and use the factors in the Bail Reform Act to make a

7  determination as to whether detention is appropriate.  That

8  is, you will stay in custody of the United States marshal.

9          Or whether or not conditions and/or a combination of

10  release conditions are appropriate that would allow you to

11  remain in the community pending the resolution of the case.

12          We are going to have that hearing at 10:30 a.m., but

13  as I said, I think that I would like a more complete picture

14  than what I have about you, and that is why I am going to ask

15  pretrial to do a supplement to the report, and we will get

16  together at 10:30 a.m., and we will figure this all out.

17          But make no mistake, I am instructing you and

18  ordering you not to leave this building.  You are not to leave

19  this building, and I have said this a million times to people,

20  and they leave the building.  Do not leave the building for

21  any reason.  Do not leave the building.  And we will see you

22  back at 10:30 a.m.  All right, anything else?

23          MR. KHARDORI:  Your Honor, the parties have

24  conferred and respectfully request that an arraignment be held

25  at 10:30 a.m. as well.

 1              THE COURT:  Sure, that is fine, too.  If that is

 2   amenable to everybody, we can do that as well.  All right,

 3   thank you.  See you at 10:30 a.m.

 4              THE CLERK:  All rise.  The Honorable Court stands in

 5   recess.

 6       (Whereupon, 9:12 a.m., the case was set aside and at

 7   11:17 a.m. the case was recalled.)

 8              THE CLERK:  The Honorable Timothy J. Sullivan

 9   presiding.

10              THE COURT:  Good morning.  Government, call the

11   case.  Have a seat, please.

12              MR. KHARDORI:  United States of America versus Lee

13   Elbaz, Criminal Case No. TJS-17-2534.  Ankush Khardori on

14   behalf of the Government along with Nick Mitchell.

15              THE COURT:  All right.  Mr. Lopez, good morning.

16              MR. LOPEZ:  Good morning.

17              THE COURT:  All right, so just as a preliminary

18   matter, before we left, everybody said they wanted to have an

19   arraignment, but then when I went back, it dawned on me that I

20   don't have any information that there is an indictment.

21              So I have a criminal complaint.  So I am not sure

22   exactly -- I am unaware, in my 30 years, I am unaware of any

23   arraignment that goes with a criminal complaint so unless the

24   Government has got an indictment that hasn't been presented to

25   the Court yet, or they plan on getting it today at some point,

1    I don't think we can move forward with the arraignment.

2              The only thing we can do is set in a preliminary

3    hearing date depending on what happens.

4              MR. KHARDORI:  Your Honor is absolutely correct.

5    Thank you, Your Honor.

6              THE COURT:  So I have asked pretrial in our district

7    to do a supplemental report, and they are here in the

8    courtroom as well.  And both parties had an opportunity to

9    review the pretrial services report.

10             And other than the conclusion and recommendation,

11   are there any material objections or corrections that either

12   side wishes to make to the supplemental pretrial services

13   report?  Government?

14             MR. KHARDORI:  The Government has reviewed it.  We

15   have no objections or corrections.

16             THE COURT:  Mr. Lopez?

17             MR. LOPEZ:  Yes, Your Honor.  I was talking with

18   Mr. -- I was trying to reach him after we walked out.  One

19   part that we didn't quite cover were her ties within the US.

20             She has an aunt, which we know about.  She has the

21   friend, --- , which we know about, but there was another

22   friend that she is very close with, that she gave to the

23   arresting officer his name and number she was supposed to

24   spend with him that night.  That is one piece of information

25   that wasn't available.

1              A very, very close friend of hers for over 10 years

2     who is also willing to post bond, a significant amount of

3     bond.

4              He is married, he is a green card holder.  If this

5     is not the perfect time for this, that is fine.  He lives in

6     New York.

7              THE COURT:  So basically you are telling me that

8     there are other people who can be included in the report who

9     could either provide financial assistance or a place for her

10    to stay or whatever, and you are going to raise that in your

11    argument but it is not in the report.

12             MR. LOPEZ:  It is slightly more than that in that it

13    is not just people willing to put money up.  She has more ties

14    to the United States.

15             THE COURT:  You are saying they need to be put in

16    this report?

17             MR. LOPEZ:  Well --

18             THE COURT:  I will put them in.  Who are they?

19             MR. LOPEZ:  Sure.  The one is in New York.  Amnon,

20    A-m-n-o-n, T-u-a-f.

21             THE COURT:  T-u-a-s?

22             MR. LOPEZ:  F as in Frank.

23             THE COURT:  Okay.

24             MR. LOPEZ:  A close friend of hers since 2008.  She

25    was going to be staying with him the first night here.

 1              THE COURT:  Okay.

 2              MR. LOPEZ:  How much more information would you like

 3   on him for the purposes of --

 4              THE COURT:  That is all I need right now.  Who else?

 5              MR. LOPEZ:  And then the second one was Meital,

 6   M-e-i-t-a-l.

 7              THE COURT:  I am sorry.  M --

 8              MR. LOPEZ:  M, e as in echo, i, t as in Tom, a, l as

 9   in Lima.  Levari.  L-e, v as in victor, a-r-i.

10              THE COURT:  Okay, and who is this person?

11              MR. LOPEZ:  Also a very close friend who also lives

12   in New York.

13              THE COURT:  Okay, so we will make sure that they get

14   included in the report.  So other than that, both parties have

15   reviewed the pretrial services report.  Let's talk, before we

16   begin --

17              MR. LOPEZ:  Your Honor, sorry.  Apologies.  One more

18   objection -- a couple more objections.  Forgive me, Your

19   Honor, if you think this is more appropriate at a different

20   time.  I would just like to add color to the discrepant

21   financial information comment.

22              Apparently there is a discrepancy between what she

23   said her assets were and what her aunt, who lives here,

24   believes them to be in Israel.  That is the discrepancy.  It

25   is not her own discrepancy.

1                THE COURT:  All right, that -- go ahead.  That

2    doesn't move the needle in any direction.  What is your next?

3                MR. LOPEZ:  The next one is with respect to the

4    active ICE detainer, I would object to that.

5                THE COURT:  I was just getting ready to talk about

6    that so go ahead.  So you object to that.

7                MR. LOPEZ:  Yes, I object to that.  It is an

8    unsigned detainer.  It is an unsigned form that has never been

9    served on her.  Six days ago, unsigned, not acted upon.  And

10   one second.  I actually have an immigration attorney here to

11   speak to that if it were to become an issue as to what the

12   operation might be.

13               But my understanding is that the proceedings as a

14   whole will continue, not just today but the prosecution,

15   without ICE interfering until this matter is resolved.  That

16   ICE detainer, as I said, I would take objection to the fact

17   that is being active.

18               THE COURT:  As being what?

19               MR. LOPEZ:  An active ICE detainer.  It is described

20   as an active ICE detainer.  I would say it is a form that is

21   unsigned.

22               THE COURT:  All right, so let me ask the Government

23   about that.  Before I do that, any other issues with the

24   report?

25               MR. LOPEZ:  I raised this with pretrial but they

1   said it was the same difference but possession of a valid

2   foreign passport, CBP has her passport.  She doesn't --

3              THE COURT:  Okay, I understand.  Okay.  Anything

4   else?

5              MR. LOPEZ:  No, that is all I have.

6              THE COURT:  Okay.  So Government, help me understand

7   what the significance of anything is to this unsigned ICE

8   detainer and Mr. Mitchell, I hope he gave you a heads up.

9              I think these ICE detainers are like nonsense, and I

10  think they are prophylactic, and, you know, I have warned

11  other assistant US attorneys that there is a case from the

12  District of North Dakota where a Magistrate Judge does an

13  exhaustive review of ICE detainers and how ICE detainers

14  interplay with the Bail Reform Act.

15             And whether or not it is appropriate to just

16  automatically say ICE detainer, and then, oh, everything has

17  got to stop, and we don't make further inquiries as to whether

18  a Defendant, subject to release conditions or a combination to

19  release conditions because, oh, ICE detainer.

20             And I am trying to figure out -- again, I am not an

21  immigration Judge.  I don't know anything about immigration

22  but my understanding is that this Defendant came into the

23  United States lawfully.  Name on a manifest, flew from Israel

24  to New York City, comes into the country lawfully, has a

25  passport, gets arrested on my arrest warrant, and suddenly

 1  this person who comes into the United States lawfully should

 2  be detained because there is an ICE detainer.

 3          So why are you presenting or what is the argument

 4  that you are presenting to the Court, this unsigned ICE

 5  detainer that -- and what is the relevance to anything that

 6  you are going to argue today, if anything?

 7          MR. KHARDORI:  It is not relevant, Your Honor.  We

 8  fully agree -- Mr. Mitchell also did give me a heads-up but I

 9  think you are right on all scores.

10          THE COURT:  Okay.  So there you go, you won your ICE

11  detainer issue.  So let's talk about risk of flight.

12  Government?

13          MR. KHARDORI:  Your Honor, I recognize I was in

14  front of you a couple hours ago and I was remiss, and I

15  apologize, that I referred to the flight risk, and that is a

16  serious issue here but I think you flagged a more, perhaps the

17  more pertinent one, which is the danger to the community, the

18  economic danger.

19          This is a serious economic crime involving a lot of

20  victims.  To date 33 complainants to the FBI alleging losses

21  of a million dollars.  And there is a serious risk that, that

22  kind of harm could be ongoing.

23          Now I recognize that it is the defense's position

24  that the Defendant disassociated with the company a couple of

25  months ago.  The information that pretrial received was a

1    little difficult for me to decipher because it says at one

2    point she was on medical leave, at one point she is unemployed

3    as of now, but also that she received a paycheck as recently

4    as apparently last week.

5          So we have serious concerns given the conduct that

6    is at issue here that there could be further losses to the

7    community, not just Americans.  This has been a worldwide

8    problem.  So that is the economic --

9          THE COURT:  As we stand here today, what is

10   the -- and again nothing is in concrete but the estimated

11   fraud loss that the government could prove at this juncture

12   based on this criminal complaint?  Do you have an estimate as

13   to what the Government would argue to a District Court Judge

14   as to what the fraud losses --

15         MR. KHARDORI:  At this time, about $1.1 to $1.2

16   million.

17         THE COURT:  All right, go ahead.

18         MR. KHARDORI:  We expect that number to go up as

19   additional victims are identified.  The second issue we have

20   is the quite serious risk of flight.  Now I understand the

21   Defendant has some friends here and an aunt here but she is an

22   Israeli citizen, she has the preponderance of her ties,

23   familial and otherwise personal, appear to be in Israel.

24         Her ties to Israel themselves seem a little, not

25   entirely firm and permanent, meaning that we can't even be

1   assured that if she were to go back to Israel that we would be

2   able to find her because she may end up somewhere else

3   entirely after that.

4        So we have a very serious concern about the risk of

5   flight, and we don't think that concern is sufficiently

6   ameliorated by the proposed bond package, which itself is

7   apparently a moving target and without any real documentation

8   or evidence to support it.  So those are our two principle

9   concerns.

10       THE COURT:  So why can't -- to alleviate the flight

11  risk, why can't lots of financial charity be posted and have

12  her living at a certain address, perhaps under electronic

13  monitoring.  Why isn't that appropriate to address the

14  Government's concerns about both economic danger to the

15  community and risk of flight?

16       Why are we jumping right to detention at the first

17  resort here?

18       MR. KHARDORI:  Well, as you know, our burden on the

19  flight risk is preponderance standard, and what we know now,

20  right, is a proffer I suppose, of about a half million dollars

21  in equity in a home that the Defendant's aunt has in

22  California.

23       We don't know anything about whether there are any

24  other encumbrances on that property, liens, mortgages.  That

25  is not enough assurance, in the Government's view, to compel

1   her.

2            The other issue with respect to -- to compel her to

3   be appearing here, and --

4            THE COURT:  Yes, by the way, what do you think about

5   that, that this Magistrate Judge in the Eastern District of

6   New York, what weight should I give that?

7            He or she told this Defendant to be down here at

8   9:00 a.m. this morning, and shock of all shocks, she was here

9   at 9:00 p.m. this morning.

10           So you would think that if she wanted to -- she saw

11  the handwriting on the wall and she had a copy of these

12  charging documents, she would not have shown up in Court

13  voluntarily this morning for these proceedings so doesn't that

14  at least have some consideration that by her actions, she has

15  proven that she will come to Court as directed because she got

16  some mysterious -- I can't even read it, by the way.

17           It is like -- the copy I have is not really good.

18  You have got to turn it sideways and hold it up against a

19  solar eclipse or something to try to figure out what exactly

20  it is but the Judge up there put a $1.2 million bond in

21  effect, so has that been perfected?  Do you know?

22           MR. KHARDORI:  No, we have no knowledge about

23  whether that has been perfected.  And with respect to that

24  Judge having made a determination, it is my understanding

25  effectively that he was -- at least the Government advocated

1    that it be put on here so that you could make that

2    determination.  This is the District Court where she is being

3    charged now.

4            With respect to her showing up this morning, now the

5    hearing in New York ended I think at about 4:00 p.m. yesterday

6    afternoon, so we are talking about 18 hours in between.  That

7    is not a lot of time to get another passport and get out of

8    the country.

9            So I think it tells us a little bit but not much at

10   all really about whether the Defendant would appear for all

11   further proceedings.  It only takes one time to not show up to

12   derail these proceedings.  And, you know, being here for this

13   appearance is not nearly dispositive an argument and doesn't

14   tell us much.

15           With respect to the GPS monitoring, now the GPS

16   monitoring is not monitoring in real time.  So it is useful.

17   If someone is in the US and you think they are going to be in

18   the US and they don't show up, the Government can go out and

19   find them, right?

20           There are plenty of cases where people have cut

21   those bracelets off and the Government loses them.  And it is

22   extremely -- virtually useless when you are talking about

23   someone who, where the risk of flight is abroad because you

24   are not going to find out that they are gone until someone

25   checks, and lo and behold they are gone.  You can't just go

 1  and round them up.

 2           So I don't think the GPS monitoring, under the facts

 3  of this case, really help us out much at all.

 4           THE COURT:  All right, thank you.  So counsel, so I

 5  can be an equal opportunity annoyance to both of you, why in

 6  the world am I going to give conditions of release to this

 7  Israeli citizen who may have a couple good friends and an

 8  aunt, on her best day.

 9           Who has absolutely not only, you know, micro ties to

10  the community here in the District of Maryland, which are

11  none, but her ties to the United States, writ large, are

12  tenuous at best and given what you have read now in the

13  affidavit, which I am the one who issued the arrest warrant so

14  you know, I feel fully up to date on what the allegations are

15  in this case.

16           What is your argument to me that, one, your client

17  is not an economic danger to the community based on the fraud

18  loss and the scheme that has been alleged by the Government.

19  And of course a Grand Jury hasn't found probable cause yet but

20  as we all know, it is not, despite what the forefathers

21  anticipated, not very hard for the Government to get

22  indictments in any federal district.

23           But tell me what your plan is for risk of flight

24  because this is one of these weird cases where she thought she

25  was coming in to go to some birthday gathering and she got

 1  arrested, so she wasn't anticipating this. Probably wouldn't

 2  have come here if she knew she was under investigation.

 3          And what conditions or combination of conditions of

 4  release are you going to suggest that would reasonably assure

 5  that she doesn't flee, she doesn't try to get out of the

 6  United States, and go back to Israel or wherever.

 7          I think risk of flight is a real, real concern here

 8  and I would be interested to hear what your position is on

 9  conditions and/or combination of release conditions.

10          MR. LOPEZ:  Yes, Your Honor. The prosecutor made a

11  statement about what we know.  Let me tell you what we know

12  and why risk of flight is going to be mitigated and why there

13  are reasonable conditions to assure, a combination of

14  conditions, to assure her appearance as required.

15          What we know is that this is a nonpresumption case.

16  We know that it followed a process in EDNY.  It first went to

17  pretrial services there, and I understand it went here as

18  well, who exercised the professional and reasoned judgment.

19  They have experience in these things.  They have looked at

20  this case.

21          And they have recommended pretrial release with

22  conditions.  They thought the conditions could make sense to

23  assure her appearance.

24          THE COURT:  Okay, but let me ask you this.  Again,

25  you seem to be very competent but you know and I know that

1    Rule 5s out don't often get the attention that they are

2    supposed to get because all we are doing is -- we are just a

3    pass-through for the jurisdiction that has the case.

4               So when a Rule 5 comes to me, you know, my job is to

5    make sure it is the right person, give them their initial

6    appearance and then push them down the road and let some other

7    district, Magistrate Judge, worry about the merits of it.

8               So I am more concerned.  My pretrial services office

9    says detention.

10              MR. LOPEZ:  I am aware of that but let me just take

11   a step back.  And I appreciate everything Your Honor just

12   said, and I am not going to try to say they did it so you

13   should.  That is not my argument at all.

14              My argument is, they did it.  Just the fact that

15   they did it, not just pretrial services, the Mag Court spent a

16   number -- close to two hours with us hearing all kinds of

17   arguments.

18              THE COURT:  Were you up there?

19              MR. LOPEZ:  I was there, yes.  I was the lawyer.

20              THE COURT:  Okay.

21              MR. LOPEZ:  Neither of these two were.

22              THE COURT:  I know.

23              MR. LOPEZ:  And again I am not saying she did it so

24   you should.  What I am saying is, she did it.  And the reason

25   why that is important is that, as the Bail Reform Act, as this

1   Court knows, she should, she walks in here today with the

2   presumption, her presumption, that she walks out of here with

3   not a bond, not a signatory of anything.

4          Then she comes back.  When it is determined that she

5   is a risk of flight, then the next step is what are the least

6   restrictive conditions possible?  Not one more condition than

7   what is the least restrictive to reasonably assure her

8   appearance at trial.

9          Those conditions were set.  They made sense

10  yesterday --

11         THE COURT:  So where is the $1.2 million?  Where is

12  that?  Has that been posted somewhere?

13         MR. LOPEZ:  Yes, so she -- they --

14         THE COURT:  Yes or no.

15         MR. LOPEZ:  Yes but not secured.

16         THE COURT:  So what does that mean?  An unsecured --

17  oh, I promise to pay $1.2 million but in order to do that I am

18  not posting any property.  I got no skin in the game and if I

19  win the Powerball, then I will be able to pay the $1.2

20  million.  But otherwise I promise to pay.

21         MR. LOPEZ:  No, no, no.  I am sorry.  I didn't get

22  to finish.  It wasn't secured yet so she has one week of the

23  date of yesterday to go to California and secure that

24  property.  I actually have a printed out, much clearer version

25  that I typed up of the conditions that were set.  I am happy

 1    to give them to the Court.

 2              THE COURT:  I am all right with what I have got

 3    here.

 4              MR. LOPEZ:  But it is a $1.2 million bond that is

 5    secured by $520,000 in equity, so it is a partially secured

 6    bond that she has in a house that she owns.  She can prove she

 7    owns it.

 8              THE COURT:  Who is she?

 9              MR. LOPEZ:  I am sorry.  Her aunt, Lemore Elbaz, is

10    standing right here.

11              THE COURT:  Good afternoon.

12              MR. LOPEZ:  Lemore is a U.S. citizen.  She has

13    her own company.  She has -- that she started -- a tech

14    start-up company.  She was able to buy this house from profits

15    from sales of stock from a previous company she had started.

16              She has a daughter who is 6 years old, whom she

17    shares custody with.  That she has a three-bedroom house and

18    extra room for her.  She has built a life here.  That is,

19    Lemore.

20              She is extremely close to Lee.  This is not a

21    situation where some distant aunt I have out in California.

22    Lemore babysat Lee, she tutored Lee.  She was in Israel a

23    month ago visiting Lee.  These two talk weekly.  They are best

24    friends.

25              She took her on her first trip abroad when she was

1  16.   This pretrial services report discusses frequent foreign

2  travel.  I have frequent foreign travel.  Everyone does.  If

3  you visit and you vacation and you are a normal person who has

4  an average amount of means, your family takes you on vacation.

5          She got taken to Cypress.  She got taken to Paris.

6  She traveled abroad after she left the army as people do.

7          I really would like an opportunity to discuss with

8  you her personal characteristics because that is the most

9  weighted factor of the three.  The nature and seriousness of

10  the offense is the least weighted factor of the three.  And I

11  do have cases I can proffer to the Court --

12          THE COURT:  From the Fourth Circuit?  I am not

13  interested in any Second Circuit cases.  I am not interested

14  in some other Circuit's interpretation of the Bail Reform Act.

15          If you have Fourth Circuit cases that tell me how I

16  should weigh the factors under 3142, that I haven't been doing

17  my job right for like 5 years because if there are certain

18  factors that are weighted and some that are less weighted,

19  nobody -- I missed that class and nobody has told me about

20  that.

21          But if you have authority from the Fourth Circuit

22  that tells me personal characteristics is the most weighted

23  factor and that all the other factors, nature and

24  circumstances of the offense, blah, blah, blah -- are less

25  weighted on some kind of scale, and that is from like a

1  published opinion from the Fourth Circuit in Richmond, I am

2  really interested to hear it.

3          If you are going to tell me that it is something

4  from Pearl Street in the Second Circuit in Brooklyn, I am not

5  really moved by that, but whatever you got.

6          MR. LOPEZ:  I won't tell you it is from Brooklyn but

7  are you moved by any other district or is it just Brooklyn

8  that you don't like?

9          THE COURT:  I am just asking do you have Fourth

10 Circuit -- I mean, you can tell me what they are and I will

11 probably go look at them.

12         MR. LOPEZ:  On that particular point --

13         THE COURT:  Because I don't think it is interesting

14 but I am asking you, do you have -- we are now in the Fourth

15 Circuit, and I am asking you --

16         MR. LOPEZ:  I don't, Your Honor.  I don't have

17 controlling law for this circuit at my fingertips for you on

18 the weight issue.  Setting that aside --

19         THE COURT: Weight of the factors issue.

20         MR. LOPEZ:  That is right.  The weight of the

21 factors, which one to weigh more than the other.  Let me --

22         THE COURT:  Just as an aside -- and sorry about

23 this.  They should have warned you that I am annoying.  What

24 is the case from the Second Circuit that you were going to

25 give me that has these -- the weighing factors?

 1          MR. LOPEZ: I am not sure why you think that it is

 2   the Second Circuit.  I am not sure that it is, Your Honor.

 3          THE COURT:  Well, maybe it would be like the ninth

 4   or something like that.

 5          MR. LOPEZ:  It is probably one of those.  Frankly my

 6   notes are -- I should never admit this.  My notes are a mess.

 7          THE COURT:  Well, we can come back to it later.  Go

 8   ahead.

 9          MR. LOPEZ:  Let me just kind of start from the top.

10   The one case I do want to cite here that I believe is from the

11   Second Circuit, so not controlling, it is Kashagi*.  It is the

12   Ninth Circuit.  It is Motomedi.  I will give it to you.  767

13   F2d 1403.

14          And the reason why I am citing this case is because

15   it stands for the proposition that doubts regarding the

16   propriety of release should be resolved in favor of the

17   Defendant.  That is why I am citing that.

18          THE COURT:  She is presumed innocent.  The Bail

19   Reform Act says she is presumed innocent.

20          MR. LOPEZ:  A little bit more than that though.  So

21   now we have two people, two professionals in New York, setting

22   aside whether it is a 5.1 or not, the Magistrate spent a lot

23   of time on this and came out with a decision that release was

24   appropriate with a bond that she said, and I don't have a

25   transcript, there wasn't time, but that was an awful lot of

1  money that put the aunt at a great deal of financial risk.

2          It says a lot about the faith of the aunt.  This is

3  a very serious amount of money.  Almost all the equity she has

4  in her home.

5          So this was a very considered opinion, and when it

6  comes down to pretrial detention here makes a different

7  recommendation, I understand that.  But now we have two

8  different people coming to a different conclusion based on the

9  set of facts here.  And that is a doubt, and that doubt goes

10  in Lee's favor.

11          You mentioned that she -- the Government wants to

12  say that there was 18 hours of time.  18 hours of time.  She

13  was in New York.  There cannot be a better city in all of the

14  United States to escape.  She doesn't need to go get a

15  passport. We all know that -- and I practiced in Miami before

16  I came up to D.C. -- that not having a passport, it is nice.

17  It is good to say, no more passport but that is not what

18  prevents people from escaping.

19          If she wanted to escape, you can't tell me she

20  couldn't have slipped off that subway, got lost in a sea of

21  people and found her way out of here.  And even if she wasn't

22  successful she could have tried.  She didn't.  She came down

23  to Maryland with her aunt, who was released in her custody.

24          Your Honor, I didn't go with her.  I got on a plane

25  and flew home.  I didn't escort her.  No one from my firm

 1  escorted her.

 2          THE COURT:  So the aunt flew from California to New

 3  York.

 4          MR. LOPEZ:  The aunt flew from California to New

 5  York and she couldn't do it on Friday when this originally --

 6  she was arrested because there wasn't time.

 7          So what happened was she gets arrested Thursday

 8  night.  She wasn't coming in for some birthday celebration,

 9  Your Honor.  It was her birthday, and she was coming to

10  celebrate with her two good friends because that is what she

11  chose to do on her birthday, on her 36th birthday.  That is

12  how close they are.  I am going to come spend this time with

13  you and I am going to stay with you.

14          She gets arrested in the middle of the night,

15  obviously not at all -- has no idea why.  I think to this day,

16  although I have gone over the complaint, it doesn't really

17  see, you know, where the issue is.  I understand what has

18  happened.  You know, why -- what she did wrong.  And the aunt

19  got here as we could.  The hearing got continued.  The first

20  Magistrate Judge wanted to see the surety.  It got continued

21  until Tuesday.

22          The aunt, who owns her own business and can do this,

23  left, came here to offer up to be custodian, to offer up the

24  security she has in her house, and I explained to her, the

25  aunt.  I keep calling aunt.  Her name is Lemore.  I explained

1    to Lemore, listen, if you are going to be a custodian, this is

2    going to be a pretty serious thing here.

3          This niece of yours that you love so much, that you

4    spend, you know, that you are so close with, you are going to

5    have to rat her out if you see her trying to leave.  You are

6    going to have to call pretrial services.  You are going to

7    have to call the marshals.  If you think that she is trying to

8    leave, you need to rat her out.

9          And Lemore's response, and she can tell you herself,

10   and forgive me, Your Honor, for saying this, damn right I

11   will.  She doesn't want to lose her stuff.  She doesn't want

12   to break the law herself by aiding and abetting.  This is very

13   important to her.  She is going to make sure this works, from

14   the San Francisco point to here, if you want to talk logistics

15   and plan.

16         One of the conditions the Judge set, which was my

17   recommendation, was that the -- and the aunt has agreed,

18   Lemore has agreed -- was that Lemore will accompany her here

19   for court hearings and at trial come here as well for the

20   trial.

21         I also offered up, although the Court declined to

22   take me up on it, a private, after-market GPS system designed

23   precisely for these purposes that are accurate within six

24   feet, update every two seconds and not only issue a 97 decibel

25   alarm when tampered with but we can have pretrial

1   services -- they can be instructed and will be instructed to

2   alert pretrial services, the marshals, the local PD.

3          I can even have Mr. Mitchell, Mr. Mitchell can see

4   it on his phone where she is at any given moment.  Your Honor,

5   let's go back to the Bail Reform Act.  Can conditions --

6          THE COURT:  Can these things work for high school

7   age children?

8          MR. LOPEZ:  Listen, I am struggling with my 4-year-

9   old.  I can't even imagine when she gets there.  So Your

10   Honor, I am jumbling around.  Let me just try and stay focused

11   here for a second.

12          First, let me just deal with what the Court actually

13   asked me to talk about in the first instance, which is this

14   danger to the community concept based on the economic crime.

15   As I said, this is not a presumption case.  This is not my

16   burden to overcome.  It is theirs to establish.

17          It is an economic crime, and those are

18   extraordinarily serious.  There is no doubt about that.  And

19   we can talk about this complaint, which I know you signed.

20   There is obviously probable cause for the complaint.  We don't

21   have detention hearings unless there is probable cause.

22          But when we talk about the offense itself, and we

23   talk about the strength of that case beyond probable cause, I

24   am going to tell you I have got some things to say about it.

25          And while it is not the time to litigate any kind

1   of, you know, merits overall, I will just talk about the face

2   of the complaint.

3          The $1.1 million alleged, Your Honor, that, under

4   2(b)1.1, set aside any adjustments up or down, those are all

5   disputable, who knows?  What we know for a concrete fact, they

6   are alleging $1.1.  That is what they have.

7          That is a base offense level of 6.  And that is an

8   add 14, and you get to 20, and 20 is 33 to 41 months.  That is

9   a lot of time.  No one looks away from 33 to 41 months.  It is

10  not a 20 year maximum, and we all know that a maximum

11  statutory sentence really doesn't mean a whole lot.

12         It is rare where you get to that maximum unless the

13  Judge, of course, wants to in his or discretion to do that.

14  So that is the type of sentence we are facing.

15         And now the danger to the community: That is not a

16  danger to the community based on what other people may still

17  be doing somewhere else that is ongoing.  Is Lee here?  She

18  gets released, is she a danger to the community?  Is she

19  somehow going to be working at some call center out of her

20  aunt's house dialing for dollars to try to get people to keep

21  on this scheme?  That is the question.

22         Not if there is ongoing fraud by somebody else.  Is

23  this woman here a danger?  This woman here is no danger to the

24  community.  Risk of flight, yes.  Danger, no.

25         Now let's talk about this woman here for a second

1  because I haven't had quite a chance to do that.  Lee Elbaz is

2  36 years old.  She has no criminal history.  Not here

3  obviously.  Not in Israel.  She is from Israel and came here

4  to celebrate her birthday with her friends.

5          She comes to the US about once a year.  Not every

6  single year.  If you check her passport, you will see a

7  pattern -- every year, every other year.  Visit a friend, to

8  tour our country, been to Vegas, been to California, Santa

9  Barbara.  Visit her aunt.  Her aunt used to live in New York.

10         Her aunt we talked a little bit about a second ago.

11  She is present here.  Lemore Elbaz.  She is a US citizen.  She

12  is a licensed lawyer.  Don't hold it against her.  I am

13  picking up something against New York but she is licensed in

14  New York.

15         She is not practicing as an attorney.  She founded a

16  tech company in San Francisco.  She lives there in a house

17  that she owns with her 6-year-old kid she shares custody with.

18  Lee is a typical person.  She went to high school as average

19  women do, everyday people.  She went to the army, as most

20  people in Israel do.  After she traveled abroad.  She took

21  some time off and traveled abroad.

22         Every single college person does that.  Well, that

23  is not true.  Not here but it is more common abroad.  Not in

24  the United States.  At least, I wasn't allowed to.  She most

25  recently worked at UCom*, which is the company mentioned.  A

1   place she has worked since 2014.  Was hired as a team leader

2   there.

3           There is a lot of debate in the complaint, we will

4   talk about it in a second, on what CEO means and what it

5   doesn't mean.  She left the company.  She no longer works

6   there.  She quit that company at the end of June of this year

7   due to medical issues.

8           And, you know, she has nothing to do with it.  The

9   prosecutor talked about how there are these discrepancies and

10  she was getting paid and maybe even paid next week.  She gets

11  a certain amount of paid sick time out.  She had a lot of sick

12  time.  She didn't take vacations so she gets paid her sick

13  time.  Her last check, I think is coming next week.

14          It is a little bit different picture than the one

15  the Government wants to paint.  As for family in Israel, yes.

16  Very normal, typical family. She has a brother and a sister.

17  We talked about contacts in Israel.  Of course she has

18  contacts in Israel. She is from Israel.  That is where her

19  family is.

20          She has a mom who had lung cancer.  Couldn't make

21  this particular trip to be here today.  She has a dad who

22  drives an ambulance.  Has for 30 years.  She is not married.

23  She doesn't have a husband back there.  She doesn't have any

24  kids back there.  She doesn't have any kids.

25          This is a law-abiding family.  Not one of them has

1   ever had any brush with the law, period, full stop.  This is

2   not someone who would flee.  This is someone who is going to

3   show up as she did today unassisted by me, with the custody of

4   her aunt, as the conditions contemplated, as were followed

5   through.

6           Nothing has changed except in her favor of showing a

7   track record.  One might think these are just words I am

8   telling you.  Yes, she is going to show up, trust me.  She

9   might say, trust me.  I am just going to show up.

10          Well, that is what we are supposed to do under the

11  Bail Reform Act, come up with those conditions that are the

12  least restrictive ones to reasonably assure her appearance.

13          Now the complaint.  Let's talk about the complaint a

14  little bit.  This complaint, while not litigating the probable

15  cause aspect to be sure, is based on two witnesses'

16  statements, alleged former employees.  The actual ownership

17  structure is not all that clear, and that is something that we

18  would be disputing.

19          We have no idea who they are.  We have no idea what

20  their credibility is.  They say certain things happened.  And

21  that is in the complaint.  But there is nothing more than what

22  they are saying, and if they are former employees, show me a

23  company that doesn't have disgruntled former employees who say

24  something happened to me.

25          You also have a group of investors.  33 of them they

1    cite.  Several they have in the complaint, who say, I didn't

2    get my money back.  They screwed me out of my money.

3          Okay, show me a company that doesn't have people

4    calling up and saying, I got screwed out of my money.  Each

5    one of those cases is a mini-trial in and of itself.

6          The third thing they have are the e-mails.  That is

7    the actual only concrete thing here.  Except the trouble is

8    they are not conclusively on their face criminal at all.  One

9    of them says that she is going to refer people to the legal

10   department.  Okay, that is what happens when you run a call

11   center.  You refer people to the legal department when there

12   is a dispute.  You don't engage.

13         THE COURT:  Or, to be cynical, as part of the scheme

14   that, when people want their money back or want their money

15   out, you set up these roadblocks that will prevent what

16   somebody is -- perhaps an innocent investor, from taking their

17   money back.  You create roadblocks as part of your scheme,

18   artifice and criminal activity to stop them from doing it.

19         MR. LOPEZ:  Okay, that may entirely but true in the

20   industry and there are probably a lot of bad apples who do

21   that.  And not only binary options but probably everywhere.

22         Everyone has bad apples, and maybe some industries

23   have more bad apples than others.  This apple is presumed

24   good.  I can't take that complaint and say, presumed innocent

25   at least.

1            THE COURT:  Are there allegations, counsel, in the

2    complaint, and again, I was a criminal defense attorney so I

3    stood where you are actually in this courtroom a bazillion

4    times but is there something in the affidavit that says that

5    she has multiple aliases?  I don't remember that.  Wasn't

6    there something in there that --

7            MR. LOPEZ:  Yes, there is, of course.  Paragraphs 47

8    and 49 are where they deal with that.

9            THE COURT:  Talk to me about that, and why isn't

10   that indicia of somebody who -- forget about the

11   guilt/innocence because that is really not my issue, and as I

12   told you earlier, I presume her to be innocent but for the

13   purposes of the Bail Reform Act but tell me why I shouldn't

14   give -- and this is your word, not mine -- this weight, you

15   like this weight context that, you know, I am not sure you

16   want it to go down.

17            But why doesn't that fact that the government

18   alleges that your client has the ability to have different

19   aliases and to represent herself to others not under her real

20   name but uses aliases, why isn't that something that should

21   also give me some concern when I am contemplating whether she

22   is a risk of flight because if she knows how to use aliases,

23   and that kind of sets off some alarm bells for me that she is

24   pretty sophisticated.

25            MR. LOPEZ:  So let me talk a little bit about that.

1    She works in a call and retention center.  It is not at all

2    uncommon for people who deal with a high volume of calls to

3    use different names.  To not use their real name.  It is also

4    not uncommon for them to come up with some name that sounds

5    familiar to the customer base that they might be dealing with.

6              When I call my cable company at my house at

7    nighttime, and I have a pause and I get transferred to some

8    location that I don't know that I am being transferred to a

9    location, and someone named Jim answers who can barely speak

10   English, is that necessarily indicative of aliases and flight?

11             Call centers do these types of things.  They use

12   stage names.  This is not a legal to-do.  In the context of

13   this complaint, there is a reference in the complaint in

14   paragraph 16 to an SEC alert.  And the SEC alert talks about

15   binary options, and it says that they may, that people

16   engaging this, may be in violation of federal law.  Not in

17   violation, maybe.

18             And then it says, you know, they may make material

19   misrepresentations.  And that is at the bottom when they give

20   other red flags.  They don't really say that those are

21   material.  And that is the question.  Is someone's name, if I

22   am talking to them in this context, is that material?  That is

23   what the complaints lacks.

24             It is a material misrepresentation that you say your

25   name is Jim when it is really something else?  That is going

1   to be for trial, right?  That is later.  But on its face here,

2   the complaint doesn't cite a duty.  The complaint doesn't cite

3   an obligation that is established between these parties.

4          Let's remember what this is.  For a lack of a better

5   term, this is betting.  For a very lack of a better term,

6   Binary Options, I call you up and say, look, I am going to

7   place a $60 bet that gold is going to be 353 cents tomorrow at

8   2:00 p.m.

9          If it is 53 cents or more, I win.  If it is not, I

10  lose.  I am not so surprised about these investor complaints.

11  People lose money here.  That is what happens, and they are

12  probably pissed about it.  But at the same time, that doesn't

13  mean that people fielding these calls using stage names are

14  making some material misrepresentations.

15         Same concept with location.  I mean, let's look at

16  paragraph 17 of this.  I am sorry, paragraph -- there is no

17  question they were talking about using different locations

18  and, you know, there are a thousand reasons why that might be

19  so, in particular when you are talking about some place in

20  Israel.

21         You don't want to advertise you are talking to

22  someone in Israel.  I am not sure that it is true or not true.

23  What I am trying to say is that the strength here, what she is

24  supposedly going to run away from is not as strong as the

25  Government wants it to be.

1          They do a lot of things in this complaint to make it

2    think like this is some Nigerian boiler room or some sort of

3    lottery scam.  That is none of these things.  It is a

4    legitimate business, legal type of business in Israel as well

5    as here, and if you look at paragraph, just to point something

6    out to you of how the complaint is drafted to kind of get you

7    in that spot, look at nine, paragraph nine, for a moment.

8          It talks about a company called Spot Option, which

9    is own related, not part of the same company as UCom.  The

10   Government doesn't dispute that.  And it wants to tell you

11   about a former employee at Spot Option.  Someone who no longer

12   even works at Spot Option.  We don't know who they are.

13         And it says that Spot Option is based in Israel but

14   the contact portion, --- portion of that Website shows

15   locations in other places of the --- .

16         I have no idea what the relevance of that is.  I

17   have no idea who this person is, if he even knows his own

18   company but I can tell you, you can go on any major

19   corporation's Website and their contact us place is going to

20   list a location or two, and they are going to have a ton of

21   other offices.

22         Here in DC, almost every company has an office for

23   government relations.  They don't list those on the Website.

24   I am not sure where that fits in.

25         There is another paragraph that says, the Apple

1   iPhone doesn't carry these apps, which also is not true.  I am

2   not sure where that fits in.  It is a leap.  Maybe it fits

3   into the broader scheme.  Of course, potentially it does, but

4   how does Apple not carrying an iPhone make her scared that she

5   has got to get out of this country?

6          And I will tell you, Your Honor, it doesn't.  You

7   know, these witness statements say all kinds of things that

8   when I read them -- I mean, I separated out each one for Lee.

9   What are the witnesses saying about Lee?  What are the e-mails

10  saying?

11         The witnesses say that she brags about soothing

12  customers.  Okay, all right.  The witnesses say that, you

13  know -- that is exactly what she is supposed to do.  She runs

14  a call center.  The witnesses talk about how your bonus and

15  incentive options for making certain targets, and -- this is

16  paragraph 51, Your Honor, and that it motivated sales staff to

17  take whatever steps necessary to convince customers to deposit

18  funds.

19         It is kind of two things imbedded here.  I will deal

20  with one of them.  This is not an e-mail saying, from Lee

21  saying, take whatever steps necessary.  It is not even a

22  statement from the witness that said, Lee told me, take

23  whatever steps necessary.

24         This is an impression of what motivates people to do

25  things.  How is that possibly something that she is going to

1  run away from?  That is so scary that she is going to run way?

2           These two witnesses, we have no idea who they are.

3  By the way, the idea of convincing a company to stick with you

4  to deposit more, to continue business, every time -- again, I

5  actually do hate my cable company.  I call my cable company, I

6  threaten to leave.  They convince me why I need to stay, every

7  single time.

8           This is not a Nigerian boiler room.  It is not a

9  lottery.  It is a business, legitimate business, that we are

10 talking about here.

11          Back to the e-mails just for a few.  As I mentioned,

12 to defuse the situation, I mentioned where she says in

13 paragraph 59 -- I am sorry.  I lost track of myself here.

14          It is in 58.  You know, an investor is complaining,

15 and the e-mail --- says Lenna* is watching this e-mail as

16 well. She would like to schedule a call with you when you are

17 available.

18          Someone complains.  The manager here says, let me

19 call you back.  Let's talk about manager/CEO.  A lot made of

20 the CEO.  We have got a couple of different things going on

21 here.  CEO in Israel may not mean the same thing here.  She is

22 the manager of this whole retention center.  Sure, she

23 supervises other people.  She may even supervise other

24 managers, I don't know.

25          She does not own this company.  There is not one

1  allegation in here that she owns it.  In fact, there is a

2  statement in here contrary to that in paragraph 44 that she is

3  not -- that she reported to the owner.

4         She is not an owner.  It says she reported to the

5  owner.  She is not an owner of the company.  She had only been

6  there four years.  She has $20,000 of liquid assets.  She is

7  not the CEO as we think of things as the CEO.  Even the

8  complaint itself talks in paragraph 53 that she used it

9  because it made customers feel important.

10        Is that material to make me feel like am talking to

11 the head honcho when I am really not talking to head honcho?

12 I don't know.  It doesn't sound like it to me but maybe in

13 some --- of this case it is.  I don't know.

14        Complaint fails to say -- they don't that next step.

15 They say there are aliases but they don't say why that is a

16 material issue.  On the aliases piece, she has an e-mail

17 address and she signs it with her own name, Lee.

18        This is, you know, there can be all kinds of experts

19 later, disputes back and forth, but the standard operating

20 practice when you deal in high volumes, you don't want you

21 name out there.  You don't want your e-mail out there on some

22 spam list.

23        There are all kinds of reason in this particular

24 type of business to do such things.  And the idea that you

25 have got disgruntled, former alleged employees making some

1   statements, and you have got investors who are engaging in a

2   risky business mad that they lost the money.

3            And you have got e-mails that are on their face not

4   evidence of criminal action.  They raise eyebrows, no

5   question.  I am not going to tell you they don't raise

6   eyebrows.  I am not trying to tell you this is a story that I

7   read to my 4-year-old and there is nothing to see here.

8            What I am trying to tell you is that there are a lot

9   of points of this complaint that are worth fighting, that

10  should be fought, and that are not, given the amount of time

11  that we are talking about -- maybe I am jaded because I have

12  seen some big sentences where people were still potentials

13  that were released.

14           It is not a situation where she is going to run at

15  the first light.  She didn't, by the way, run at the first

16  light.  There, in this district by a different Magistrate

17  Judge, conditions on facts, economic crime, living in another

18  area, pretrial release was also granted.  I can tell that was

19  Magistrate Judge Grimm.

20           I can tell you about the facts of that case if you

21  want.  Told to live in Atlanta as opposed to the district,

22  Maryland here.  Maybe it was North Carolina.  Again, I

23  apologize, Your Honor.  I can get it actually straight if you

24  want it.

25           But I am trying to say here, Your Honor, is that

1    from a personal characteristics of the Defendant, setting

2    aside whatever weight should be assigned.  Let's assume they

3    are all equal, and believe me, I am not going down any road to

4    convince you otherwise.

5              THE COURT:  That ship has sailed.

6              MR. LOPEZ:  And it is really frankly, to me it is

7    not -- that is important.  Facts stand for themselves.  Each

8    of these factors, on the facts, stand for themselves and all

9    of them support pretrial release in this case.

10             You have got a law-abiding citizen in another

11   country.  That is pretty much what is holding her here for the

12   Government.  I didn't hear much other than that, that of

13   substance.  And being a foreign national in and of itself, is

14   not a reason to detain with no conditions, right?

15             That doesn't get you to no conditions.  She -- on

16   the nature and the seriousness of the offense, of course, it

17   is a serious offense alleged: wire fraud, victims, potential

18   victims at this stage.  None of that has been really

19   established.

20             As I mentioned, each one of these investor cases is

21   a mini-trial on their own.  There are always two sides to a

22   story.  I don't know what happened here.

23             And then when you talk about the weight of the

24   complaint against Lee herself as opposed to the industry.  If

25   you look at that complaint, there is a lot in there about

1    industry norms and in general.  Generally speaking, industry

2    insider.

3            What about Lee?  What do we have about Lee?  She had

4    stage names.  She had other people in her office who were

5    doing stage names.  Okay, I don't know that, that is material

6    to this case and it is sure not indicative of risk of flight

7    here today.

8            She has e-mails where she is telling people not to

9    make mistakes.  Some of them raise more eyebrows than others

10   about how things are wired.  I don't know what that is.  It is

11   not a sanctions case.  It is not like a stripping situation.

12           I don't know what is happening here.  These are all

13   things that are going to be explored but they sure don't, on

14   their face, when looked at, paint a picture of the crime of

15   the century or that she is the mastermind of it.

16           In fact, I bet you the Government doesn't even

17   believe she is the mastermind of it despite what they are

18   saying here.  I am sure there are other people they want much

19   higher than her if there is a crime here at the end of the

20   day.

21           Your Honor, she stands before you with a loving,

22   very close relative with assets to post.  To serve as

23   custodian.  She has a friend in New York who is willing to

24   post more money.  He is married to someone who is right now

25   under consideration for a state judgeship.

1          They are willing to put that money that they have at

2    risk as well if called upon to do so.  She is not going to put

3    her aunt in jeopardy.  Her aunt won't let her be put in

4    jeopardy. I can tell you more about the GPS, every two second,

5    six foot accuracy for Mr. Mitchell and whoever else wants it.

6    I don't think Mr. Mitchell actually wants it.

7          THE COURT:  He is shaking his head.  I don't  think

8    he wants it.

9          MR. LOPEZ:  But detention is an extreme.  And

10   according to you, you know this.  Detention is the last

11   resort.  I don't see how we are anywhere near the last resort.

12          If anything, as every day goes forward, she shows

13   her track record of being able to comply.  The aunt is, you

14   know, Lemore and her, there is a 5:00 p.m. flight out of DCA,

15   not Dulles, DCA.  The difference is important.

16          Dulles is an international airport.  DCA is a

17   national airport.  Nonstop to San Francisco.  She will be

18   under house arrest in San Francisco with GPS, with the -- and

19   these are the conditions that were found reasonable at the

20   Magistrate Judge and pretrial services up in New York.

21          $1.2 million secured by $500 equity in aunt's house.

22   The aunt also has equity in another house worth $600,000.  Her

23   share is co-owned with her ex.  I don't know how she secures

24   that.  That is the issue.

25          She also has about $100,000 in assets, and that is

1   how we get to $1.2 million.  And she is ready to sign on the

2   dotted line no problem.  Home incarceration, travel restricted

3   as the two districts for court appearance, attorney visits,

4   medical emergencies.  The aunt must travel with her.

5   Surrender passports and not reapply.

6          Report as directed to pretrial services.  GPS

7   monitoring and then there was another condition added of no

8   communication with any co-Defendant or conspirator known to

9   the Defendant, all persons involved with the companies named

10  in the complaint or alleged unlawful activities except in the

11  presence of counsel.

12         That should hopefully ameliorate any issues of

13  ongoing fraud because if they get wind that she is doing any

14  of this, that is a violation of her condition.

15         Your Honor, I end where I started.  What do we know?

16  We know a process was followed.  We know folks in New York who

17  disagree obviously with the folks down here.  Exercise their

18  own judgment.  I can't speak to how fast they did it, how much

19  time they took into consideration, how much care they made.

20         But nevertheless we have to trust in the process,

21  and they did what they were supposed to do.  And they came up

22  with reasonable conditions.  The Magistrate Judge went through

23  that same exercise.  Nothing has changed except those

24  conditions are even more reasonable today due to her

25  appearance here before Your Honor.

1          I ask you to apply the Bail Reform Act as I know you

2   will.  Let these conditions stand.  I am not even sure -- I

3   think there could be even less-restrictive means but these

4   work so I am not going to push my luck in that regard,

5   especially given the uphill battle I am facing.

6          Let her go to the bathroom when she wants to go to

7   the bathroom.  Let her take a shower when she wants to take a

8   shower.  Let her wear what she wants in the house.  Let her

9   get a snack when she needs to get a snack.

10          She is presumed innocent.  She should not be

11  detained.  This is a case where they apparently have done

12  search warrants.  There are going to be lots of documents.

13  There is going to be discovery.  They have got cooperators.

14          I don't know when this is going to trial.  Why is

15  she being locked up during that time when she showed up here

16  today?

17          18 hours.  In other pretrial detentions, the first

18  second, someone is going to flee.  The first second they can,

19  they are out of here.  Apparently my next argument, I can say,

20  well, it takes about 18 hours for someone to leave, according

21  to the Government.  She didn't.

22          This is not to her.  This is the same as every

23  Defendant, so I don't mean to say this is, in fact, the very

24  least weighted, if any weight.  It is going to be difficult

25  for me to prepare a defense with her, and for her to prepare a

1    defense with anybody incarcerated.

2            In San Francisco she can come to Orrick's offices.

3    We are based in San Francisco.  Sit with a videoconference

4    with me, and we can do this.  We can do this the right way,

5    the way it deserves to be done.

6            This is not a simple cocaine case.  You know, was

7    the cocaine under the seat or was it not?  This is going to

8    trial in a month.  Your Honor, the Bail Reform Act, under its

9    terms, is designed to protect the Defendant, not a sword for

10   the Government.

11           Let's follow that Bail Reform Act and impose these

12   conditions here, which have proven to be, well, maybe not the

13   least restrictive.  Restrictive conditions enough to assure

14   her appearance as required.

15           THE COURT:  Okay.  All right, thank you.

16   Government, anything else?

17           MR. KHARDORI:  Yes, Your Honor.  I will try to be

18   brief.

19           THE COURT:  Why don't you concentrate on a little

20   bit about -- Mr. Lopez talked about, and I have no real

21   interest in it one way or the other but why don't you talk to

22   me briefly about what the Government alleges this Defendant's

23   roles is in this scheme to steal money from other people by

24   the binary option thing.

25           And once they start making money, they don't let you

 1  have your money back and then they steal all your money.  What

 2  is the Government's allegation as to this specific Defendant's

 3  role in this conspiracy?

 4          MR. KHARDORI:  Well, Your Honor, the defense said

 5  that CEO doesn't really mean CEO.  That is, I think, actually

 6  even conceitedly itself a misrepresentation, right, because

 7  that title may very well matter to people.

 8          So we have direct misrepresentations by this

 9  individual, not just about her title but about her name and

10  where she was.  She is managing this team of people who are

11  also -- and then helping them set up aliases, proving aliases.

12          And I think there are e-mails cited in the complaint

13  in which she is address the matter of customer withdrawals,

14  and at a bare minimum is facilitating the creation of those, I

15  think as you put it, those roadblocks.

16          All of that is fraud.  All of that is fraud.  Very

17  briefly, the points that were raised about this, which I

18  thought were disturbing diminishments of the allegations in

19  the complaint, to put it mildly.

20          The use of aliases is serious.  When you call your

21  cable company and you are speaking to someone who may not give

22  you their real name, I think that is a very different matter

23  than maybe when you pick up the phone and call your financial

24  advisor.

25          When you pick up the phone and someone is selling

 1   you a financial product, that is very different.  At the cable

 2   company, that may not be material.  It is going to be material

 3   here.  I bet the investors wanted to know or else they

 4   wouldn't be lying about it.

 5          The roadblocks argument, the notion that other

 6   people do it, well, I don't think that tells us anything

 7   except this particular kind of conduct may be very

 8   unfortunately rampant.

 9          The notion that it is betting, okay?  Well, here is

10   the difference between gambling at a casino and what we are

11   talking about here.  Nobody is lying to you about your odds at

12   a casino, okay?  Nobody is calling you up and coaxing to

13   invest more money in a financial product that, mathematically,

14   you are going to lose money in.

15          That is the fraud.  It is not the existence of the

16   casino, right?  Casinos functions properly, if they are

17   obviously licensed in the right jurisdictions, if they are not

18   lying to the people about the kinds of money that they can

19   make.

20          I do also want to just -- for the record, I was not

21   at the detention hearing.  I finished a trial yesterday so I

22   was not able to make it but a colleague of mine who covered

23   it, I have spoken to him extensively.  We heard a lot about

24   what happened in New York.

25          From my understanding, it was 100 percent clear,

1  despite the suggestion otherwise, that this was de novo today

2  here.  So clean slate.  So all we know is what happened over

3  the last 18 hours.  And I mentioned why I think that doesn't

4  tell us much at all.

5        And in fact I think we heard quite a bit about how

6  easy it is to get away.  Slipping out on the subway.  And also

7  this business about pretrial with the professionalism of the

8  people in New York.  I have no doubt about that.

9        I also have no doubt about the professionalism and

10  thoroughness of the people here.  So I don't think we should

11  be suggesting that any one or the other is somehow better at

12  this.  These are difficult decisions as you well know, and

13  people are doing the best they can, and from what I have seen

14  and heard about what happened in New York, a much more

15  thorough job was done here this morning than was done there.

16        Also finally with respect to the notion that there

17  is no criminal history, as I am sure you well know, that is

18  very often the case in white-collar cases, someone is going to

19  show up with no criminal history.

20        So I think we have spent a lot of time during the

21  course of that presentation litigating the merits of the

22  complaint, which you obviously signed off on.  So no probable

23  cause.  We are here.  Question is, whether this person should

24  be out.  We talked about the harm, the economic harm, and the

25  very serious risk of flight.

1            I don't think you have enough facts or we have

2     enough facts to get comfortable that she is going to be here

3     based on this currently unsecured bond.

4            THE COURT:  So let me ask you this though.  And I

5     will here from pretrial in a second and I am also going to

6     hear from the proposed third-party custodian.  But what if I

7     loaded up on the money and, you know, Mr. Lopez, just one

8     word, yes or no, was it the understanding of the Magistrate

9     Judge in the Eastern District that this would be a de novo

10    review of her release conditions, yes or no?

11           MR. LOPEZ:  Yes.  I never meant to suggest --

12           THE COURT:  What?

13           MR. LOPEZ:  Yes, I never meant to suggest otherwise.

14    I was just showing that there were reasonable differences.

15           THE COURT:  So what if I loaded up on the financial

16    component of this, made the third-party custodian post the

17    property before I release the Defendant, made the Defendant

18    post unsecured bond, and make sure that all the land records

19    were protected and that the third-party custodian would say

20    posted collateral up to, let's say, $2 million.  And that was

21    done before this Defendant was released from custody.

22           Would that address some of the Government's -- put

23    it on EM at her aunt's house in San Francisco, would that

24    ameliorate some of the Government's concerns or no?

25           MR. KHARDORI:  Some but not all.  I think here is

1    the fundamental problem with that.  I think the complaint

2    makes very clear this is a multimillion dollar fraud.  We are

3    not talking about just the Defendant who may or may not be at

4    the top of the totem pole here, right?

5          That means there are going to be other people who

6    are going to be interested in potentially helping, and there

7    are potentially unindicted co-conspirators.

8          So we are talking about sources of funds abroad that

9    could also potentially be put to use to make someone whole if

10   the bond package isn't falling apart.

11         THE COURT:  But at this point in time, the evidence

12   that you have in the complaint -- not an indictment but in the

13   complaint -- you don't give me any information that you have

14   linked bank accounts to her, that money has gone directly to

15   her, that she has personally benefited from this.

16         You say to me that she is probably the CEO because

17   if you are a CEO in the United States you are probably a CEO

18   in Tel Aviv or Israel. That she has fake names when she deals

19   with investors and she gives instructions through e-mails to

20   the call center about how to mislead and rip off their quote,

21   unquote clients.  I get all that.

22         But what -- do you have any other evidence that you

23   care to share about this Defendant's specific role in this

24   very large conspiracy to defraud people?

25         MR. KHARDORI:  No, I think that actually, accurately

1  sums up the allegations, yes.

2          And I think just at this particular junction, I

3  don't think we have enough available information, even if

4  proposed a very steep bail package, that it could be satisfied

5  or that it would be commensurate to the very serious flight

6  risk that we have here.

7          And that is really our central concern here, about

8  that particular issue, the notion that a lot of money could be

9  put up.  Well, that is not the sole issue, right?  The issue

10  is not just a lot of money but is it commensurate with the

11  risk?  And there is an extremely serious flight risk here.

12          THE COURT:  And what do you base that on?

13          MR. KHARDORI:  Well, this person has the bulk of her

14  ties --

15          THE COURT:  No, I know, so she doesn't have a lot of

16  ties to the United States but she has an aunt here who is

17  willing to post money and be third-party custodian.  Willing

18  to let her live with her.  Willing to accompany her to all

19  court appearances.  So it is not like, defense is saying,

20  well, just let me out and I promise I will come.

21          There are some conditions that have been presented

22  by the defense that could reasonably assure her appearance

23  and, you know, what information other than just the obvious,

24  that she doesn't have -- she is not a second-generation

25  Washingtonian or hasn't lived in Prince George's County or the

1  southern division for her entire life, what is the

2  Government's argument that she -- specific, with

3  particularity -- that she is a serious flight risk because now

4  she has got these conditions that she is offering that would

5  mitigate against those.

6          MR. KHARDORI:  Well, I don't think, much beyond, as

7  you noted, what we have already sort of gone over.

8          One of the things that is actually rather telling is

9  we keep hearing -- and to my understanding this happened in

10 New York, we were hearing a lot about friends who mysteriously

11 never show up.

12         So maybe if we have one or two here but, you know,

13 in every single appearance, my understanding is more and more

14 friends get added to the list who don't show up.

15         So I understand logistically it is not easy for

16 people to travel and things like that but a lot of this is

17 just happening on the say-so, frankly, of the defense counsel

18 and that is not good enough for us.

19         THE COURT:  All right, thank you.  Pretrial, any

20 other comments other than your report, and is there any

21 impediment with courtesy supervision in I guess would be the

22 Northern District of California if I go that direction?

23         MS. McCABE:  Good morning, Your Honor.  Beverly

24 McCabe from pretrial services.  We actually have not had an

25 opportunity to staff the case with our office there in San

1  Francisco.

2           They weren't open this morning so we have, if Your

3  Honor is inclined to release, we would respectfully ask that

4  we have an opportunity to ask our office there to go out and

5  actually do a home inspection at the proposed third-party

6  custodian's residence and then also investigate any properties

7  or moneys that are going to be posted to make sure that there

8  are no impediments to using that to make sure that the

9  complete bond can be met before the Defendant is released.

10          THE COURT:  All right, thank you.  All right,

11 Ms. Elbaz, is that how you pronounce your name?  Come on up.

12 Good afternoon.  Please raise your right hand.

13      (Whereupon, the party was sworn.)

14          THE COURT:  You can put your hand down.  What is

15 your full name?

16          MS. ELBAZ:  Lemore Elbaz.

17          THE COURT:  And where do you live?

18          MS. ELBAZ:  I live at 1633 Burrows Street in San

19 Francisco.

20          THE COURT:  And what is your occupation?

21          MS. ELBAZ:  I am the founder and CEO of a start-up

22 company, a software company.

23          THE COURT:  And you heard Mr. Lopez -- are you a

24 licensed attorney?

25          MS. ELBAZ:  I took the bar and passed it in New

 1  York.  I have a license in New York and Israel.  I don't

 2  practice though.

 3          THE COURT:  But you are licensed to practice law in

 4  the state of New York?

 5          MS. ELBAZ:  Yes.

 6          THE COURT:  And anywhere else?

 7          MS. ELBAZ:  Israel.

 8          THE COURT:  In Israel, okay.  Prior to yesterday, I

 9  guess, when was the last time you saw the Defendant?

10          MS. ELBAZ:  In August on my trip to Israel.

11          THE COURT:  And describe for the nature of your

12  relationship with her.

13          MS. ELBAZ:  She is my first niece.  She is like my

14  daughter.  I mean, she made me an aunt.  So we are very close.

15  I babysat her as a teenager.  I tutored her when she went to

16  school.  I helped her when she went to college.  She stayed

17  with me in Israel many, many times in my own apartment in

18  Israel when I used to live there.

19          When I moved here, she visited me and stayed with me

20  for a long trip when I lived in Palo Alto.  She was supposed

21  to visit me this time.  She is very, very close to me.

22          THE COURT:  Who lives in your residence?

23          MS. ELBAZ:  Just me and my daughter, and I have an

24  in-law downstairs.  I sometimes Airbnb.  I intend to stop

25  doing that for her to stay there given the circumstances.

 1            THE COURT:  So you sat here, and I saw you move from

 2    seat to seat to seat.  But I know you are anxious about this

 3    but if I ask you to post $2 million, all of the equity,

 4    everything you own on Burrows Avenue or Street, whatever it

 5    is, and any other cash assets that you have, secured by your

 6    real property and an unsecured by her, would you be willing to

 7    post everything you have to reasonably assure that she won't

 8    leave the United States to avoid facing the charges in this

 9    district?

10            MS. ELBAZ:  So Your Honor, I am actually posting

11    everything I have, which is worth $1.2 million.  I also have a

12    share in my company.  And I am willing to post that too.

13    Maybe so I explain the breakdown so you understand where it is

14    coming from.

15            My house on Burrows Street is a house I own on my

16    own, and it is worth $1.2 million.  I have a mortgage of

17    $600,000 on it.  So it is about -- my down payment was

18    $420,000 but it is worth $1.2 so we are assuming it is about

19    $520,000, my share in it.  And I have a mortgage statement to

20    prove my ownership of that house.

21            The second thing I have is in my bank account about

22    $110,000 and I am posting that too.

23            The third thing is a house on Eugenia Avenue, which

24    I co-own with my ex.  And as co-owner, I am allowed to post

25    only my assets in that asset.

 1              The house is worth about $2 million.  There is about

 2    $650,000 mortgage on it.  And I have a share of between

 3    $600,000 and 700,000 depending on how much we will sell it

 4    for.

 5              And the reason I didn't want to put a lien on it is

 6    I am in a process with my ex to sell that house.  So whatever

 7    money comes out of that house, I am willing to post as a bond

 8    for her.

 9              I have no doubt she is not going anywhere, Your

10    Honor.  She has never done -- she was never pulled over.  This

11    is all one big mistake and I am sure it is going to clear out.

12    I wish I could say she is sophisticated enough to run such a

13    scheme and as her aunt I am saying painfully she is not

14    sophisticated enough to do that and I know that because I

15    taught her math.

16              THE COURT:  So let me -- I am terrible at math and I

17    became a Judge.  So I don't what that means -- let me ask --

18    don't talk too much about the case.  You understand though, if

19    I make you third-party custodian you are going to have certain

20    responsibilities to be basically the eyes and ears of the

21    Court, and if she starts doing anything or causes you concern

22    about not following the conditions that I set, you are

23    going -- I don't care whether she is your niece or not -- you

24    are going to have to have the obligation to contact pretrial

25    services and tell them that she is not doing what they told

1    her to do.  Do you understand that?

2              MS. ELBAZ:  Absolutely, absolutely, sir.  My

3    daughter is here.  She is 6 years old.  I dragged her out of

4    school to be here.  I have no intention to put my daughter's

5    life and future at risk.  I have no doubt she is not going

6    anywhere.  And I put my life on it.

7              THE COURT:  And you have no doubt -- wait a minute.

8    You have no doubt that I will make sure that you lose your

9    house and every asset that you post and forfeited to the

10   Government if she runs?  Do you understand that?

11             MS. ELBAZ:  Absolutely, absolutely.

12             THE COURT:  That is a risk that you are willing to

13   accept?

14             MS. ELBAZ:  Absolutely, sir.  She is not going

15   anywhere.  She is going to clear her name.  I want her to be

16   able to visit me in the United States.  She is not going

17   anywhere.  This is all one big mistake.  She should have never

18   been arrested.

19             THE COURT:  Okay.  All right, you can have a seat.

20   Thank you.

21             MS. ELBAZ:  Thank you, sir.

22             THE COURT:  Anything else anybody wish to say?

23             MR. KHARDORI:  Not from the Government, Your Honor.

24             THE COURT:  All right.  This matter is before the

25   Court for a detention hearing.  The Government is moving for

1   detention on two prongs:  Both that Ms. Elbaz is an economic

2   danger to the community, given the allegations contained in

3   the criminal complaint, and more pertinent is the Government

4   is moving for detention under the Bail Reform Act because they

5   believe that Ms. Elbaz is a risk of flight and a risk of

6   nonappearance, particularly given the allegations in the

7   complaint and her lack of ties to the United States of

8   America.

9           She is not a citizen of the United States of

10  America.  She is a citizen of Israel.  Was living in Israel

11  and traveling to the United States when she was arrested on an

12  arrest warrant at International Airport in New York.

13          And the Government is suggesting that there are no

14  conditions and/or combination of conditions of release that

15  would reasonably assure her appearance in Court.

16          The defense argues that -- spent a lot of time

17  talking about the merits of the complaint, which I have no

18  interest in and, in fact, as I have said, tried to move it

19  along in a nice way, saying that I presume her to be innocent

20  so we didn't need to hear about that but we did.

21          Says that now that the aunt is willing to step up to

22  be third-party custodian, that there are, in fact, conditions

23  and/or a combination of conditions of release that would allow

24  her return to the community, particularly San Francisco under

25  the supervision of the Northern District of California

1    pretrial services if they accept the case as well as third

2    party to her aunt at that Burrows Street address.

3              You know, this is a tough case because you can go

4    either way.  Weighted factors or nonweighted factors.  I think

5    that I would be totally justified and could write an opinion

6    order that would be bulletproof on review by just determining

7    on my own, which I am allowed under the Bail Reform Act, that

8    this Defendant is a serious risk of flight.

9              She really has no, except for her aunt and a couple

10   friends, she doesn't really have -- and she has no ties to

11   this community.  No ties to the District of Maryland.  And

12   even on her best day she has got an aunt and some friends, and

13   that is hardly sufficient for me.

14             We all know that criminal complaints are the tip of

15   the iceberg and we all know that, you know, sometimes the

16   Government's cases are in progress and that we don't really

17   know the full scope of what the alleged criminal conduct is.

18   All we know in this case is this very tip, this very little

19   snippet that the Government has chosen to put in the criminal

20   complaint that I obviously signed.

21             I consider all the factors under the Bail Reform Act

22   to be important and I don't think that any more of them are

23   important than others, and I apply them across the board as

24   fair as I can.

25             I am going to issue conditions of release in this

1  case but Ms. Elbaz is going to be detained in the custody of

2  the marshal until all the conditions are met.  And the

3  conditions of release are as follows:

4           I do believe, given the circumstances and given the

5  aunt's willingness to post money and other conditions that I

6  am going to impose, that there are release conditions that

7  will eventually be appropriate for her to be released but they

8  are going to be in place before she steps out of this

9  courtroom, and if it messes up flights and stuff like that, I

10 am sorry but that is just the way it is going to be.

11          Ma'am, please listen carefully to this.  I am going

12 to pass it down to you in writing when I am done.  You may not

13 violate any federal, state or local laws while on release.

14 You must reside at an address approved by pretrial.  You must

15 appear in Court as required and surrender to serve any

16 sentence imposed.

17          I am directing that you personally execute an

18 unsecured bond binding you to pay to the United States of

19 America the sum of $1 million in the event of a failure to

20 appear as required or surrender to serve any sentence imposed.

21          I am placing you under the third-party custody of

22 your aunt, Lemore Elbaz, at the address approved by pretrial

23 in the Northern District of California.  You may not change

24 your address, as I said, without pretrial services' approval.

25 The third-party custodian is to supervise you in accordance

 1  with all the conditions of release, to use every effort to

 2  reasonably assure your appearance at all scheduled court

 3  hearings and to notify the Court immediately if you violate

 4  any of these conditions or disappear.

 5          You are under the supervision of pretrial services.

 6  You must report on a regular basis to the supervising officer.

 7          You shall promptly obey all reasonable directions

 8  and instructions of the supervising officer.  I am directing

 9  the third-party custodian, who agreed to execute a bond in the

10  amount of $2 million secured by her real property and other

11  assets.

12          That $2 million will be forfeited to the United

13  States of America in the event that the Defendant disappears

14  or fails to appear in Court.  A significant amount of that,

15  whatever the numbers work out to be, will be posted to secure

16  the collateral at 1633 Burrows Street, San Francisco,

17  California.

18          That an order of Court will be signed, and that

19  this, that order, the order that I sign, has to be filed among

20  the land records for San Francisco or that address to evidence

21  the security interest of this Court and the Government in that

22  residence as well as the residence -- what was the other

23  address?  The one that you own with your ex-husband?  What is

24  that?

25          MS. ELBAZ:  It is 15 Eugenia Avenue.

1              THE COURT:  Eugenia Avenue?

2              MS. ELBAZ: 15, 1-5, Eugenia, E-u-g-e-n-i-a.

3              THE COURT:  And where is this at, San Francisco too?

4              MS. ELBAZ:  San Francisco, California, 94110.

5              MR. LOPEZ:  Your Honor, I don't know if it is

6    appropriate for me to say anything but I don't know -- she

7    doesn't actually have $2 million, I don't know that she has

8    securable assets in that regard.

9              THE COURT:  She is going to post -- she has got $1.6

10   in assets --

11             MS. ELBAZ:  $1.2.

12             THE COURT:  I am just talking about net amounts.  I

13   don't care about what your equity is in it at this point.

14   That you have a $1.6 million residence, a $1.2 million

15   residence on Burrows Street, and then you have half, roughly,

16   whatever your half interest is on Eugenia.  That comes out to

17   about $2 million.

18             MS. ELBAZ:  $600 I have in that --

19             THE COURT:  Okay, so $1.8.  That comes out to about

20   $1.8.

21             MS. ELBAZ:  Yes.

22             THE COURT:  All right.  So I will make it $1.8.

23   That is fine.

24             MS. ELBAZ:  Can I secure an asset that I have a

25   mortgage on, Your Honor?

 1                THE COURT:  I don't really care about any of that

 2    because if she disappears the Government is just going to take

 3    whatever you have got and they can sort that out later.  I

 4    could care less about the net or whatever.

 5                If she disappears, the Government is going to take

 6    your property, and then you can fight with the Department of

 7    Justice about how much you owe and how much you don't owe, and

 8    you will never see any money because they will take the money

 9    to make up the $1.8 million that you owe the Government.  So I

10    am not really interested in what your equity is in the

11    property or not.  It is not really important for my

12    discussions now.

13                MS. ELBAZ:  I understand, Your Honor.  I am just

14    asking physically if I will be able to secure the property for

15    any amount larger than what I owe on it because I have a

16    mortgage.

17                THE COURT:  You are posting the property that has

18    $1.2 million.

19                MS. ELBAZ:  Yes, but if releasing her is dependent

20    on me being able to go to San Francisco and get the security,

21    I am just wondering if I will be able to get the security that

22    is more than what I can secure there.

23                THE COURT:  You don't have to do anything.  All you

24    have to do is I am going to sign a bunch of orders, and you

25    are going to sign them too, and one of these orders is going

1   to direct you to file one of these pieces of paper among the

2   land records for where you are.

3           So you don't have to go -- there is no action by you

4   other than filing something in the land records and giving me

5   proof that you did to pretrial.

6           MS. ELBAZ:  Thank you.

7           THE COURT:  But you don't have to like go try to get

8   real hard currency to put in an escrow or anything like that.

9   This is just in the event -- hopefully it never occurs but it

10  is in the event that she fails to appear.  Otherwise, if

11  everything goes fine and the case gets resolved however it

12  gets resolved, then the lawyer files a motion to me saying,

13  hey, the case is over.  Please release the third-party

14  custodian.

15          And I sign an order that you can take to the land

16  records where you live and take this cloud of the title.  So

17  all I am doing now is like --- and clouding your titles.  That

18  is all I am doing.

19          MS. ELBAZ:  I understand.  I just wanted to know if

20  it is physical to put a lien on the house on more than my --

21          THE COURT:  That is a good point.  All right, ma'am,

22  you are to surrender any passport, which has been done,

23  immediately to the Clerk's Office.  ---, passport or travel

24  documents.  Your travel is restricted to the district, the

25  Northern District of California and the District of Maryland,

1    or I guess Washington, DC, if you come visit your attorney.

2            Your Office, Mr. Lopez, is in DC?

3            MR. LOPEZ:  Your Honor, my office is in DC but I am

4    hoping you can put as part of these conditions that she can

5    visit Orrick's San Francisco office so that way we can be

6    videoconferencing.

7            THE COURT:  She can go anywhere in the

8    Northern -- we will get to that in a second.

9            Ma'am, you are to avoid all contact, directly or

10   indirectly, with any person who is or may become a victim or a

11   potential witness in the investigation or prosecution of this

12   case, including but not limited to any witnesses and

13   co-Defendants.

14           Government, do you wish to provide a list to

15   Mr. Lopez of people she should not have contact with or not?

16           MR. KHARDORI:  Not at this time, Your Honor.

17           THE COURT:  Okay, all right.  Ma'am please listen

18   very carefully to this.  There are a lot of people in pretrial

19   detention because they violate this condition.  I am not sure

20   how smart you are or how not smart you are.  It is obviously

21   who knows but if you reach out to anybody associated with this

22   case, any co-workers, any witnesses, any co-Defendants,

23   anybody to talk about this case, or figure out who is doing

24   what, who is talking to who, what has happened to whom, that

25   is an expressed violation of my release conditions.

1             If you have questions, you ask your lawyer.  If you

2    reach out by any means whatsoever, it is a violation of these

3    release conditions.  Do you understand that?

4             THE DEFENDANT:  Yes, sir.

5             THE COURT:  Ma'am, you must refrain from possessing

6    a firearm, destructive device or other dangerous weapon.

7    Refrain from any excessive use of alcohol.  I am directing

8    that you submit to a location monitoring program.  You are

9    restricted to the residence of the third-party custodian

10   except for medical purposes, court appearances, attorney

11   visits or other activities specifically approved by pretrial

12   in advance.

13            Now, here comes -- this will be like another

14   30-minute discussion, which I really don't feel like having

15   but is this a case, Government or pretrial, where we should

16   restrict her access to the Internet given the nature of the

17   charges?

18            MR. KHARDORI:  Yes, certainly.

19            THE COURT:  Mr. Lopez, any comment on that?

20            MR. LOPEZ:  I don't think that is at all necessary.

21   The Government clearly has an ongoing investigation.  They are

22   clearly going to know if she has violated the Court's order of

23   contacting others and so on.

24            I don't think that is a condition that -- first of

25   all, I don't think they met the danger prong.  Second, it

 1  definitely doesn't go to -- I don't think it goes to risk of

 2  flight  either.  Third, practically if the Court were to go

 3  that way I think it is, tell her not to do it, her aunt has a

 4  tech start-up company.  She can't not have Internet in that

 5  house.  Maybe in the room --

 6          THE COURT:  This happens all the time.  I mean, the

 7  aunt -- I mean, I am not going to punish the third-party

 8  custodian's use of the Internet but they can password protect

 9  things and protect the devices from her use.  That happens all

10  the time.

11          MR. LOPEZ:  I don't think that is necessary and

12  frankly it would really impinge upon my ability to communicate

13  with her as well.  We are going to be passing documents back

14  and forth.  We are going to be doing things.  I would much

15  rather her be able to do those things and use the Internet in

16  that regard.

17          She also -- yes, I just don't think that the facts

18  of this case warrant limiting.  I don't think it is realistic

19  to think that she is --

20          THE COURT:  The allegation is that she has used the

21  Internet and used e-mails to perpetrate a fraud.  How is that

22  not relevant?

23          MR. LOPEZ:  As part of a whole thing that they are

24  saying happened in Israel --

25          THE COURT:  Forget about that.  Yes, just answer my

 1  question though.  Just answer my question.  The allegation is

 2  that she has used the Internet under different names to

 3  perpetuate bank fraud or whatever the allegation is here, and

 4  that she has used the Internet as one of the vehicles upon

 5  which the Government alleges she committed federal crimes.

 6           And my question -- really simple.  You said no, and

 7  that is fine.  That what confidence do I have, if I don't put

 8  this restriction on, that she will continue to use the

 9  Internet to either obstruct justice, talk to co-Defendants,

10  talk to witnesses, try to do whatever because that is the MO

11  that is contained in the criminal complaint in the affidavit?

12           That this Defendant, despite whatever role she may

13  or may not have, whatever level of supervision she may or may

14  not have, it is pretty clear she has used the Internet to

15  communicate with quote, unquote investors, and has used other

16  names and also has communicated with other employees at her

17  place of employment about how to do their business.

18  So I am just -- I am just wondering.

19           MR. LOPEZ:  Your Honor, I just don't.  E-mail is the

20  way people function today.  That fact alone doesn't carry the

21  same weight it does maybe 10 years ago.  I would say it is not

22  realistic to think that she is a danger of committing ongoing

23  fraud by having access to the Internet.

24           MR. KHARDORI:  Your Honor, if I could just

25  briefly -- you are exactly right.  This is an Internet fraud.

1  Already we are chipping away at the conditions here.  10, 20

2  minutes ago, it was, oh, she can go to the videoconferencing

3  at my office in San Francisco.  Now it is I have to be able to

4  e-mail with her.

5          This case involves alias e-mails, false e-mail

6  addresses so we have no assurance that the Government can

7  necessarily even determine what is occurring while she is

8  accessing the Internet.

9          THE COURT:  All right.  Ms. McCabe, what are your --

10  do you have any thoughts on this one condition given the

11  nature and circumstances of everything that you have just sat

12  through for the last hour?

13          MS. McCABE:  Your Honor, I believe it is an

14  appropriate condition.  If I may also --

15          THE COURT:  Did you say is?

16          MS. McCABE:  I believe it is an appropriate

17  condition.  It would have been a condition I would have

18  recommended given an opportunity.

19          Additionally, Your Honor.  We do have a concern.  We

20  are unsure.  The Defendant didn't report that she is no longer

21  employed at the present time so we just want to make sure that

22  is the case, that while she is here in the US, that she is not

23  going to be working.

24          THE COURT:  No, my intention is this.  It is very

25  simple.  I am moving a jail cell from the District of Maryland

1   to a 1633 Burrows Street, and she will be locked down in that

2   residence 24/7, not allowed to go outside, not allowed to sit

3   on the stoop, not allowed to take the trash out, not allowed

4   to go have a cigarette outside or whatever.

5          She will be able to leave when pretrial says it is

6   okay to leave, and those will be for medical purposes, court

7   appearances, attorney visits or any other matters approved in

8   advance by pretrial.

9          Other than that, she is locked in her aunt's house

10  24/7.  Period, end of discussion.  Then that way I have

11  confidence that she won't be a flight risk, and that is my

12  intention.

13         So she won't be having a job somewhere.  And she

14  doesn't even have -- I mean, if we are going to be stickler on

15  ICE and immigration, she doesn't even have the ability to even

16  lawfully work here in the United States.

17         And if she wants to commit future crimes by this

18  company, then that is on her.

19         MR. LOPEZ:  Your Honor, just on the Internet piece,

20  I may have something.

21         THE COURT:  Why does she need to use the Internet in

22  the first place?

23         MR. LOPEZ:  I will tell you why.  I will tell you

24  the reason is that basically to be able to Skype her mom and

25  Skype her dad or Facetime her mom or dad.  You need an

1    Internet connection to do that.

2              THE COURT:  Mr. Lopez, I am old but I am not that

3    old.  Go ahead.  I understand about Facetime and Skype.  Thank

4    you for the technological tutor but I know what that means.  I

5    must be looking really old lately.

6              I am not going to put that as a condition now but

7    ma'am, be cognizant of the fact -- and the reason, a part of

8    me kind of agrees with Ms. McCabe that I think it is

9    appropriate.

10             But if you are foolish enough to -- I am sure they

11   will be doing what they do, the Government, and if you are

12   foolish enough to engage in misuse of the Internet to

13   facilitate or try to cover up or obstruct or interfere or

14   impede justice in the prosecution or any other case that is

15   related, and if you try to tamper or try to retaliate against

16   people or try to intimidate people and you use the Internet to

17   do that, then shame on you, and you will be in jail.  It is

18   that simple.

19             Ma'am, you may not open any new lines of credit of

20   any kind without prior pretrial approval.  You are not to

21   engage in the binary option business whatsoever.

22             The third-party custodian must personally accompany

23   the Defendant to all court appearances and all meetings with

24   counsel, and if they happen in DC fine.  If it happens in San

25   Francisco, third-party custodian also must attend that as

1   well.  And any such meetings must be approved, or travel must

2   be approved in advance by pretrial obviously under the

3   conditions.

4          The Defendant will stay in custody of the marshal

5   until such time as pretrial has evidence that the bond has

6   been posted pursuant to these release conditions.

7          MR. LOPEZ:  Your Honor, can I just make it a little

8   bit more specific on the attorney piece in San Francisco

9   because I would like her to be able to go to our offices at

10  405 Howard Street.

11         THE COURT:  Yes, I know.  Orrick has a San Francisco

12  office.  She has to get approval by pretrial that --

13         MR. LOPEZ:  That is fine but the aunt doesn't have

14  to --

15         THE COURT:  The aunt has to go.

16         MR. LOPEZ:  To drive her there?

17         THE COURT:  Yes.

18         MR. LOPEZ:  Now can she be -- once she gets there,

19  can she --

20         THE COURT:  She can sit in the lobby.  I bet you guy

21  have a really nice lobby there with like cappuccino machines

22  and stuff like that.  And she can sit in the lobby while your

23  client is Skyping with you on the Orrick Intranet.  But my

24  purpose of this is when Ms. Elbaz is out in the community,

25  that she is accompanied by her aunt.

1           MR. LOPEZ:  I get that.  My question is whether an

2  attorney in our office could then -- we are barred, we are

3  under ethical obligations.

4           THE COURT:  I know.  I bet you guys are great

5  lawyers.  I am sure you are but I am not going to -- no, no.

6           MR. LOPEZ:  Thank you, Your Honor.

7           THE COURT:  The reality is, like everything else, if

8  we start moving down the road and she seems to be in

9  compliance and we can revisit if pretrial says that, you know,

10  we can tweak some of these -- that they believe in their

11  professional judgment, given what is going on, that we can

12  tweak some of these conditions of release, then I will be

13  amenable to considering it.

14           I am not going to guarantee I am going to do it but

15  despite everything that has been said, I consider her to be a

16  flight risk.  Is it enough of a flight risk to detain her?

17  That is a tough call for me.  And it is really close.  It is

18  really a close call for me.

19           But I am giving her the benefit of the doubt given

20  your filibustering here that I am going to impose what I

21  consider to be the least restrictive conditions, and these are

22  them because the next step is detention.  There is no

23  intermediate step.  This is as good as it is going to get for

24  her.

25           And as we move down the road, one or two things are

1    going to happen.  She is going to violate them.  And I am

2    going to issue an arrest warrant if the Government asks me to.

3    And I am going to put her in custody in San Francisco and she

4    can get on the marshal van or plane and be brought here to

5    Maryland and we will figure out what to do with her.

6              My hope is that she abides by these release

7    conditions to the letter and we don't have any problems moving

8    forward.

9              MR. LOPEZ:  I will take the hint, Your Honor, and

10   pipe down.

11             THE COURT:  You don't have to pipe down.  You are

12   being a zealous advocate for your client.  I got it.

13             Ms. McCabe, any other conditions other than what I

14   said I am not going to do?  Any other conditions that pretrial

15   believes appropriate?

16             MS. McCABE:  No, Your Honor.

17             THE COURT:  All right, I am going to have to go back

18   and write these up really quick.  In fact, Brandon, just give

19   me another conditions release form.

20   (Pause)

21             MR. LOPEZ:  Your Honor, I am sorry to interrupt

22   you.  The surety has another question and I want to at least

23   make sure I ask even though I think I answered it for her.

24             THE COURT:  All right, what is your question?

25             MR. LOPEZ:  She is a bit confused as to whether she

1    has to fly back to California, file papers, and then fly back

2    here before she can do it or is there some way to commit to

3    have it done in 24 hours.

4              THE COURT:  Doesn't Orrick have an office in San

5    Francisco?

6              MR. LOPEZ:  We do.

7              THE COURT:  Okay.  So, I mean, she is going to be

8    signing documents that are going to be killing a lot of trees.

9    That she is going to be signing a document that has to be

10   recorded among the land records for whatever county or however

11   they do land records out in California, I don't know how they

12   do them.

13             She needs to file my order both for Eugenia Avenue

14   and Burrows among the land records evidencing the Government's

15   interest in the collateral for property.  If Orrick's San

16   Francisco office can do that, then she doesn't have to fly to

17   California to get it done.  It can all be done by -- I think

18   you might have to overnight the order because they might

19   require an original.  I don't know how all that works but she

20   can stay here until all that is done.

21             Otherwise, yes, counsel, she is going to have to fly

22   back to California, do it, and then fly back here to accompany

23   her niece back to San Francisco.  But Orrick has a San

24   Francisco office.  And maybe you guys can work with her to get

25   my order secured among the land records without having her

 1   travel back and forth, and if that can happen, that is fine

 2   too.

 3              MR. LOPEZ:  Okay, Your Honor, I got the picture.

 4              THE COURT:  All right.

 5         (Whereupon, at 1:02 p.m., the hearing was concluded.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the

duplicated electronic sound recording of the proceedings in

the above-entitled matter.




*Laura C. Jackson*    *10/13/2017*
Laura C. Jackson              Date
Transcriber